**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **LISA LEWIS** | ) |
| **1151 4th Street, SW, #519** | ) |
| **Washington, DC 20024,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No.** |
| | ) |
| **JACK LEW, SECRETARY** | ) |
| **U.S. DEPARTMENT OF THE TREASURY** | ) |
| | ) |
| **Defendant.** | ) |
| _____) | ) **JURY TRIAL DEMANDED** |

**COMPLAINT**
**(Race and Sex Discrimination)**

Pursuant to Federal Rule of Civil Procedure Rule 3, Plaintiff Lisa Lewis (hereafter "Plaintiff"), by her undersigned attorney, hereby files her Complaint.

**I. JURISDICTION AND VENUE**

1.  This Court has jurisdiction of the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e-5(f).

2.  In or about October 5, 2011, Plaintiff filed an EEO complaint (Appeal No. 0120140540, EEOC No. 570-2012-00526X, Agency No. OCC-11-0731-F alleging that Defendant discriminated against her on the bases of race (African American) and sex (female).

3.  On October 25, 2013, the EEOC issued a decision without a hearing.

4.  On November 1, 2013, Defendant issued a Final Order implementing the EEOC's decision.

5.  Subsequently, Complainant filed a timely EEOC appeal from Defendant's November

1, 2013 Final Order adopting the EEOC's decision.

6.   On June 3, 2016, the EEOC ruled against Plaintiff on her appeal.

7.   On September 14, 2016, the EEOC ruled against Plaintiff's request for reconsideration of the adverse appeal decision.

8.   This Complaint is filed within 90 days after Plaintiff received the decision for her request for reconsideration.

9.   Plaintiff has exhausted the administrative remedies available to her under 42 U.S.C. §§ 2000e, *et seq.*, and all conditions precedent have occurred or been performed.

10. Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), as Defendant U.S. Department of the Treasury (hereinafter "Defendant") has extensive and deliberate contacts in this District and Division, including a business location at 799 9th Street, NW, Washington, DC 20001, at which Plaintiff performed work during her tenure with Defendant.

## II. PARTIES

11. Plaintiff is a resident of Maryland and a current employee of Defendant.

12. Defendant is a federal agency headquartered in Washington, DC which employs more than 500+ individuals. Defendant is a person within the meaning of 42 U.S.C. § 2000e(a), and an employer within the meaning of 42 U.S.C. § 2000e(b).

## III. FACTS CENTRAL TO PLAINTIFF'S CLAIMS

13. Plaintiff is an African American female.

14. Plaintiff began working for the Comptroller of the Currency on January 3, 1999.

15. In 2002, Defendant promoted Plaintiff to personal security technician after providing training for her to prepare for this position.

2

16. Plaintiff was assigned to the Critical Infrastructure Protection and Security (CIPS) office. This office is now called the Office of Security.

17. Plaintiff performed her duties in a satisfactory manner.

18. Plaintiff received satisfactory performance evaluations.

19. Agency policy limits the number of evaluation scores that are above satisfactory.

20. It is very, very common for employees to receive a performance appraisal rating of 3.

21. Mr. Evin Gossin is a Caucasian male.

22. Mr. Gossin began working for the Comptroller of the Currency in November 2006.

23. Mr. Gossin's direct supervisor was Mr. Ron Shelden.

24. Mr. Ron Shelden was Assistant Director of Critical Infrastructure Protection and Security.

25. Mr. Ron Shelden is a Caucasian male.

26. Mr. Shelden's supervisor is Mr. Roger Mahach, another Caucasian male.

27. Mr. Mahach also supervised Mr. Ron Bell and Ms. Carole Scribner.

28. In early 2011, Ms. Lewis and Mr. Gossin were in the same position description.

29. Ms. Delores "Dollie" Hood is a Native American female.

30. Ms. Hood is a Personnel Security Specialist, NB-V.

31. Ms. Hood has over 25 years of experience with the Department of the Treasury.

32. Ms. Hood's immediate supervisor was Mr. Ron Bell.

33. The Comptroller of the Currency had a previous practice of rotating the responsibility to perform adjudications.

34. Adjudications are reviews of applications for federal employment, FBI fingerprint reports, and background investigations, to determine if the application should be approved for further consideration as a prospective federal employee.

35. Adjudications require identification of issues, and may involve interviews or other research to mitigate the issues identified.

36. Plaintiff performed adjudications under the previous policy of staff rotations.

37. After Mr. Gossin joined the staff, management assigned adjudications exclusively to Mr. Gossin.

38. Ms. Hood does not know why management assigned adjudications exclusively to Mr. Gossin.

39. Mr. Gossin failed to complete one adjudication on time.

40. When Defendant announced the opportunity for "Greenbelt" training, they asked for volunteers. All the staff volunteered. Management chose Mr. Gossin for the training.

41. Defendant gave Mr. Gossin "Greenbelt" training, and then never offered it again for any other employees.

42. Mr. Gossin's Greenbelt training improved his skills and abilities as an OCC employee, exposed him to different business units, gave him opportunities to meet with management-level people, and taught him how to navigate some of the politics of implementing change.

43. Defendant never offered Greenbelt training to Plaintiff.

44. Mr. Shelden never told Ms. Hood why she was not selected for Greenbelt training.

45. The Agency approved Mr. Gossin for Blackbelt training.

46. Management never encouraged Ms. Hood to take training.

4

47. Mr. Shelden believed that Plaintiff was not interested in training.

48. The Agency offered Lean Six Sigma training only to Mr. Gossin.

49. The Agency approved Mr. Gossin for the Lean Six Sigma training when budget cuts barred everyone from training.

50. During a budget ban on travel, the Agency permitted Mr. Gossin to travel to Nashville to shadow another employee.

51. The opportunity to shadow Ms. Vance gave Mr. Gossin training in the physical security program.

52. Plaintiff noticed that Mr. Mahach spent more face time with Mr. Gossin than he did with her.

53. Mr. Mahach met with Plaintiff for about 30 minutes in an introductory meeting that did not discuss her work duties, and he has never evaluated her work performance.

54. Ms. Carole Scribner told Ms. Hood that they were grooming Mr. Gossin to assist him in moving up in the organization.

55. Other employees did not receive the same grooming.

56. When Ms. Hood was the team leader, she normally made assignments to the other team members, or was consulted about the assignments to her staff.

57. When Ms. Hood was the team leader, Mr. Shelden gave assignments to Mr. Gossin directly, without consulting Ms. Hood first.

58. When Ms. Hood was the team leader, Mr. Shelden went to Mr. Gossin directly about work issues and did not go through Ms. Hood, even after Ms. Hood complained to Mr. Shelden about being bypassed.

59. Mr. Shelden denies that he gave the "best and most rewarding assignments" to Mr.

Gossin.

60. In November, 2012, Mr. Bell removed Ms. Hood from her assignment as team leader.

61. Mr. Bell told Ms. Hood that he removed her as team leader because he wanted someone with more experience.

62. At the time, Ms. Hood had twenty-five (25) years of federal experience and her replacement had nineteen (19) years.

63. Ms. Hood's replacement as team leader is a Caucasian male.

64. Since the Agency provided Mr. Gossin with Greenbelt and Blackbelt training, Defendant has not mentioned any future training opportunities for the other staff.

65. Defendant gave assignments to Mr. Gossin by habit.

66. The Agency gave Mr. Gossin more trainings than women employees received.

67. The Agency gave Mr. Gossin trainings that Mr. Mahach would not approve for Plaintiff.

68. Ms. Hood received Defendant's approval for a training and then had that approval canceled.

69. Ms. Scribner testified that she does not recall anyone from personnel security going on market surveys.

70. Mr. Gossin has done a market survey.

71. Mr. Shelden normally asked employees at evaluation time about their goals for the next five (5) years, and then offer them suggestions for achieving those goals.

72. Mr. Shelden has never asked Plaintiff about where she wants to be in five (5)

years or if there is something else she wants to be doing; he has never offered her suggestions about how to pursue her goals.

73. Ms. Angela Carter is an HR Specialist for the Agency.

74. Ms. Carter declared that the decision to create a Security Specialist Grade V opening began with a management request to promote Mr. Gossin based on an "accretion of duties."

75. Mr. Mahach stated that the Security Specialist position was created because he noticed in November 2010 that Mr. Gossin was performing work above his grade.

76. However, in a written statement made on November 7, 2011, Mr. Mahach denied that, "the vacancy in question [was] created to facilitate a promotion for the selectee."

77. Mr. Shelden denied that the position was created for Mr. Gossin.

78. Ms. Carter researched the organization and discovered that Plaintiff was in the same position description as Mr. Gossin.

79. Ms. Carter made the decision that the Grade V position would have to be advertised for "fair and open competition."

80. When asked, "To your knowledge, was the vacancy in question created to facilitate the promotion of Evin Gossin?" Ms. Carter answered, "Yes."

81. Ms. Scribner denies recalling that she was, "involved in any way in posting and preparing a position for a Pay Band V within personnel security[.]"

82. On April 26, 2011, at 11:35 am, Mr. Mahach sent an email to Mr. Shelden and Ms. Scribner saying, in part: "I sw [sic] Evin yesterday about the promotion and how it was determined that we would need to post it. I would like to go out to OCC/OTS and make sure

we capture/communicate the skills CIPS has developed in Evin or someone like Evin for the posting. Here are some additional elements for our consideration in preparing the posting."

83. Below the body of Mr. Mahach's April 26, 2011, email is an email from Mr. Gossin to Mr. Mahach timed at 11:01 am that same day. In this email, Mr. Gossin began by saying, "Good morning, Roger. I drafted some language specific to the areas you mentioned, then added the biometric category. If this isn't what you were looking for let me know and I'll be happy to adjust." Mr. Gossin's email then goes on to list some of his training and experiences, including "Lean Six Sigma Black Belt Training."

84. Defendant's job announcement for the July 12, 2011, Security Specialist opening included a rating criteria for, "Ability to use a wide range of analytic methods *** such as Lean Six Sigma."

85. When Defendant announced the Grade V position, Ms. Scribner came to Mr. Gossin's office and told him to submit his application for his new job.

86. Mr. Shelden has a vague recollection of asking Mr. Gossin if he was working on applying for the Grade V position.

87. Mr. Gossin does not recall Mr. Shelden telling him about the opening.

88. Plaintiff and Mr. Gossin both attended a conference in 2011 where Plaintiff saw on Mr. Gossin's computer an email from Mr. Shelden telling Mr. Gossin that his position was posted and telling Mr. Gossin, "we got to work on your KSA" (Knowledge, Skills and Abilities).

89. Plaintiff asked for a copy of Mr. Shelden's email to Mr. Gossin, but it has not been produced in discovery.

90. Ms. Carter issued a certificate of the candidates for the Grade V position that

included both Ms. Lewis and Mr. Gossin as qualified.

91. The Agency's position description for the Band NB-V position requires that, "Current OCC employees must have a performance rating of at least Level 3 overall and for all critical performance elements to be eligible for promotion."

92. Ms. Carter informed Plaintiff that Ms. Carter had rated Ms. Lewis as "highly Qualified" for the Security Specialist position.

93. Plaintiff understood from the HR office that her application was one of the best qualified.

94. The Agency's normal practice for selections is to let the manager just select a candidate when there are ten (10) or fewer candidates rated as qualified.

95. The Agency normally does not use subject matter experts (SMEs) when there are ten (10) or fewer candidates rated as qualified.

96. After Plaintiff learned that HR has rated her as one of the best qualified, she learned that management elected to have SMEs conduct a new rating.

97. At his deposition, Mr. Mahach testified that, "The results of the rating and ranking by HR may result in identification of one applicant as being clearly better qualified than any other, making the selection unbiased and defensible."

98. Mr. Mahach could have, but did not, interview Ms. Lewis and Mr. Gossin for the promotion.

99. Ranking Panel Member D'Mona Boykin is not a subject matter expert in the work of the security specialists at CIPS.

100. Ranking Panel Member D'Mona Boykin has never worked in CIPS.

101. Ranking Panel Member D'Mona Boykin rated Mr. Gossin higher in part because

he had Lean Six Sigma training and was working on his Blackbelt.

102. After Mr. Gossin received the Grade V position, his duties remained the same as when he held the Grade IV position.

103. Plaintiff has observed that the most recent four (4) job selections have all been awarded to white males. Furthermore, the selecting official and the first line supervisor for several of these positions, Roger Mahach, Ron Bell and Ronald Shelden respectively, were also white males. These include Mr. Gossin, Mr. Allan Small (2012 Personnel Security Specialist, Grade V), Mr. Justin Solobay and Mr.

104. Plaintiff is the only black female in the CIPS office. Plaintiff is the only pay Band IV in the CIPS office. All other employees in the office are in pay Band V or above.

105. At a staff meeting before the 2012 vacancy announcement, Mr. Bell announced that that he was going to hire a personnel security specialist and that he would hire whomever he wanted.

106. On December 12, 2012, Mr. Mahach denied Plaintiff's request for training.

107. On March 12, 2013, Plaintiff moved to amend her complaint in this matter to add her claim that in mid-2012 Complainant applied for the position of Personnel Security Specialist Grade V Vacancy Announcement MP-MT-12-010 within Critical Information Protection and Security (CIPS).

108. Vacancy Announcement MP-MT-12-010 is virtually the same position for which Plaintiff was not selected in 2011 which is the subject of the instant complaint.

109. In or about mid-August 2012, Plaintiff learned that she had not been ranked highly enough to have her name placed on the certificate and that a white male had been selected.

110. At least one (1) of the panel members who rated the applications for the position of Personnel Security Specialist Grade V Vacancy Announcement MP-MT-12-010 was aware of Complainant's prior EEO activity as were her supervisor and the selecting official.

111. On March 12, 2013, Plaintiff moved to amend her complaint in this matter to add her claim that she was denied the MP-MT-12-010 position on account of her race, gender and prior EEO activity.

112. On March 29, 2013, Mr. Ron Bell signed a declaration to support the Agency's opposition to the motion for leave to amend. This affidavit is attached to the Agency's opposition served on March 29, 2013.

113. In paragraph 2 of his declaration, Mr. Bell states that, "I specifically directed Mr. Mestre that I did not want to know who the applicants were, and that he was to grade the files without regard to anything except for the merit of the candidates' applications."

114. In paragraph 2 of his declaration, Mr. Bell states that: "I was not aware until March 2013 that the complainant, Lisa Lewis, had applied for this position. I learned of this fact only from the counsel representing the OCC in this action. *** In this case, I am now aware that Ms. Lewis has complained that Roger Mahach (white male), Ronald Shelden (white male), and D'Mona Boykin (African-American female) discriminated against her on the basis of race and sex in connection with another unrelated job posting.

115. Mr. Bell's declaration permits an inference that he was attempting to deflect any indication that he had knowledge of Plaintiff's EEO activity, particularly in connection with her application for the Grade V promotion.

116. Before making his selection for the 2012 Grade 5 position, Mr. Bell had

knowledge of Plaintiff's prior complaint.

117. The prior complaint that Mr. Bell had knowledge of was the instant EEO

complaint. According to Mr. Mahach's deposition testimony, Mr. Bell was even involved in

the initial claim of discrimination because he raised his concerns about a potential EEO

complaint to Mr. Mahach, and advised him that the decision to promote Evin Gossin (white

male) over Plaintiff had to be "defensible."

### IV. <u>STATEMENT OF CLAIMS</u>

#### <u>Count I: Violation of Title VII (Gender Discrimination)</u>

118.    Plaintiff adopts and incorporates by reference ¶¶ 1-117 above.

119.    Defendant unlawfully discriminated against Plaintiff on the basis of her gender in

violation of Title VII.

120.    As a result of Defendant's violations of Title VII, Plaintiff has suffered and is

suffering injuries, including loss of past, present, and future earnings and considerable mental

distress.

#### <u>Count II: Violation of Title VII (Race)</u>

121.    Plaintiff adopts and incorporates by reference ¶¶ 1-120 above.

122.    Defendant unlawfully discriminated against Plaintiff on the basis of her race in

violation of Title VII.

88. As a result of Defendant's violations of Title VII, Plaintiff has suffered and is

suffering injuries, including loss of past, present, and future earnings and considerable mental

distress.

## IV. REMEDIES SOUGHT

118. WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting her the following relief from Defendant:

a.  A declaratory judgment that defendant discriminated against Plaintiff, as alleged herein;

b.  Back pay, including without limitation other lost benefits due to Defendant's discrimination against Plaintiff;

c.  Compensatory and punitive damages, pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(3)(A), for taking these actions with malice and bad faith;

d.  Prejudgment and post judgment interest on all damages, on the lost compensation and compensatory damages;

e.  Reasonable attorneys' fees and costs under 42 U.S.C. §§ 1981a, 2000e-5(k); and

f.  Such other and further relief as to the Court seems just and warranted.

## VI. JURY TRIAL DEMAND

119. Plaintiff requests a jury trial on all issues of fact and damages arising herein.

Respectfully submitted,

*Edgar Ndjatou*

_____

EDGAR NDJATOU
McCree Ndjatou, PLLC
1828 L Street, NW, Suite 600
Washington, DC 20036
T: (202) 290-3724
F: (202) 370-7173
endjatou@mnlawyerspllc.com
*Attorney for Plaintiff*